[Civ. No. 2086. Third Appellate District.—February 4, 1920.]

## LEAFIE E. BREWTHAUER, Appellant, v. FREDERICK W. BREWTHAUER, Respondent.

[1] DIVORCE — ENDS OF MATRIMONY DESTROYED — DISSOLUTION OF UNION.—When the relations between a husband and wife are such as utterly to destroy the legitimate ends and objects of matrimony, it is better for them and for society that the union be legally dissolved.

[2] ID.—CRUELTY — RELIANCE UPON CUMULATIVE ACTS — FAILURE TO FIND AS TO ACTS REMOTE IN TIME.—Where an action for divorce by the wife is not based upon a single act of cruelty, but upon the cumulative effect of all the acts and conduct of the defendant, extending over a period of years, and the complaint alleges that on a certain date more than ten years prior to the commencement of the action "the defendant became angry, cursed and swore at the plaintiff, grabbed her by the throat, choked and threatened to kill her," it is error for the court not to make a finding thereon.

APPEAL from a judgment of the Superior Court of Los Angeles County. J. P. Wood, Judge. Reversed.

The facts are stated in the opinion of the court.

Louis J. Euler for Appellant.

Morris M. Ferguson for Respondent.

ELLISON, P. J., *pro tem.*—The plaintiff brought this action to obtain a decree of divorce. Findings and decree were in favor of the defendant, denying a divorce, from which the plaintiff prosecutes this appeal.

The essential features of the case may be gathered from the following quotations from the findings of the court: "That on or about April 13, 1917, plaintiff and defendant had a quarrel about the repair of a pair of glasses for the plaintiff; that the quarrel became violent on both sides; that plaintiff called defendant an ex-convict, a name calculated greatly to excite the defendant; whereupon the defendant struck at the plaintiff, striking her upon the arm; that he threatened to leave her upon this occasion.

"That in the month of December, 1916, the defendant refused longer to sleep in the same bed with plaintiff, the bed they had been occupying being a large double bed; that thereafter plaintiff slept upon a lounge, which, however, was not an unfit sleeping place.

"That the allegations of paragraph 6 of the complaint have not been proven, except it is true that the defendant stated to two persons that the plaintiff unnecessarily and cruelly beat and struck her daughter; that these statements did not at the time come to the attention of the plaintiff, were believed by the defendant to be true and were not made maliciously; that the defendant did for more than a year maintain an annoying attitude towards the plaintiff; that the plaintiff also maintained an annoying attitude toward the defendant; that there is no proof that the defendant was during said time insolent toward the plaintiff; he did sulk at times; he did not for weeks at a time refuse to speak to the plaintiff; that within a year last past the defendant did tell one person, but he did not tell various parties that he hated the ground that the plaintiff walked on and that he would not live with the plaintiff; that he said this, however, not for the purpose of annoying and causing suffering on the part of the plaintiff, but because he did hate the plaintiff and did not intend to live with her; that the plaintiff had no affection for the defendant.

"That on April 15, 1917, the defendant left and deserted the plaintiff, but such desertion was not against the will or without the consent of the plaintiff; that the conduct of the defendant toward the plaintiff found and alleged in the complaint inflicted certain suffering upon the plaintiff, but the defendant did not by said acts and conduct or otherwise wrongfully or willfully inflict upon the plaintiff a course of grievous mental or physical suffering."

A reading of these findings produces, at least, a feeling that the law should not try to compel this woman to remain the wife of a man who hates the ground she walks on, who has been guilty of inflicting physical violence upon her, who does not intend to live with her, who for months has refused to let her occupy their common bed or sleep in the same room with him, and compelled her to sleep on a cot in another room.

[1] It would seem that when the relations between a husband and wife are as reflected by these findings, such a condition is presented "as utterly to destroy the legitimate ends and objects of matrimony" (*Barnes* v. *Barnes,* 95 Cal. 171, [16 L. R. A. 660, 30 Pac. 298]), and the ends and object of matrimony between them having been utterly destroyed, it were better for them and for society that the union be legally dissolved.

We are of the opinion that some of the findings above referred to are not supported by the evidence; that some are contrary to the evidence and that there is an absence of findings on some of the material allegations of the complaint.

We are also of the opinion that the general finding to the effect that the defendant had not been guilty of extreme cruelty toward the plaintiff is not in accord with the facts proved or admitted by the defendant.

As illustrative of the general attitude of the defendant toward the plaintiff, we quote from the testimony as follows: The plaintiff testified: "Well, for weeks at a time he hadn't spoken to me at the table or in the room or at any place. Sulky and disagreeable. If I would ask him for anything he would tell me to go to hell and call me an old she-devil and such things all the time."

Gertrude Lynch, a daughter of the plaintiff, testified: "For several years past he has been sulky. He was always unkind. When she would ask for clothing—I heard her ask him for clothing on one instance—and he would tell her to go and lay down, as though he were talking to a dog, and he was always telling her to go to hell and she was an old she-devil and calling her a damn fool, always sulking. At the table he would sit and not ask her for anything to eat. He would go around and search for things at the table rather than talk to her at the table."

The defendant was a witness on the trial in his own behalf, but did not deny any of this testimony. It stands uncontradicted.

The complaint alleged: "That for more than a year last past the defendant had circulated stories regarding the plaintiff that she had unnecessarily, cruelly, and unmercifully beat and struck her daughter, and that said stories were false."

The court finds: "That the defendant stated to two persons that the plaintiff unnecessarily and cruelly beat her daughter but these statements did not at the time come to the attention of the plaintiff, were believed by defendant to be true and were not made maliciously."

The witness Schultz testified: "He [defendant] said that she [the plaintiff] was mistreating her something awful, cruelly, and used to pull her by the hair and stamp her with her feet, and he felt sorry for her."

The plaintiff testified that the statement of the defendant was utterly false. The daughter referred to testified: "I don't remember any whipping as long as I can remember and certainly not in the last few years, she never treated me unkindly."

The defendant made no denial of having circulated the stories. The court made no finding as to their truth or falsity. The defendant testified to no act witnessed by him, nor to any information received from any source, that caused him to believe the things he was telling were true, and there is no evidence to sustain the finding that the defendant believed his wife had cruelly treated her daughter.

The complaint alleged: "That on the fifteenth day of March, 1917, the defendant without the consent of the plaintiff herein deserted this plaintiff." The finding of the court was: "That on April 15, 1917, defendant left and deserted the plaintiff but such desertion was not against the will or without the consent of the plaintiff." The plaintiff testified: "Q. Did you leave him or did he leave you? A. He left me. Q. Tell the court the circumstances of his leaving on that occasion. A. Well, he offered me thirty dollars to get out and pay my board some place, which I refused. The Court: Q. Did you then leave? A. I didn't leave. He left." There is no denial of this testimony. The finding that defendant deserted the plaintiff with her consent is contrary to the evidence.

[2] The complaint alleged: "That during the month of November, 1906, while plaintiff and defendant were living at East 12th Street, Los Angeles, the defendant became angry, cursed and swore at the plaintiff, grabbed her by the throat, choked and threatened to kill her." As to this allegation the court finds: "That the acts alleged in subdivision A (being the one above quoted) occurred at a time

too long prior to the commencement of this action to justify a finding of extreme cruelty based upon said allegation and the conduct of the defendant as alleged in said subdivision, whatever that conduct was, was subsequently condoned by the plaintiff.''

1. It is probably true that a court would not grant a divorce upon a single act of cruelty occurring so long ago. But the plaintiff was not asking for a divorce based upon one act. She was asking for a divorce founded upon the cumulative effect of all the acts and conduct of the defendant, extending over a period of years. This act was alleged as one of a series.

Mr. Bishop, in discussing cruelty, volume 2, section 1430, says: ''This conduct may consist, under very specific circumstances, of a single act. But commonly, with one or a few acts pre-eminently reprehensible, it is the sum of the entire conjugal life.''

A finding in favor of the plaintiff that defendant had, in 1906, choked her and threatened to kill her would have thrown much light upon the defendant's character, his attitude toward the plaintiff, his disposition to be cruel and his willingness to give scope to such disposition in cruel treatment of his wife. It was error not to make a finding on the allegation. The finding that the acts had been condoned by the plaintiff is not sustained by the evidence. ''Condonence implies a condition subsequent; that the forgiving party must be treated with conjugal kindness.'' (Civ. Code, sec. 117.) ''Condonation is revoked and the original cause of divorce revived; . . . 2. When the condonee is guilty of great conjugal unkindness, not amounting to a cause of divorce, but sufficiently habitual and gross to show that the conditions of condonation have not been accepted in good faith, or not fulfilled.'' (Civ. Code, sec. 121.)

It is apparent from the record that, since 1906, the defendant has made no attempt to treat the plaintiff with conjugal kindness. The defendant, by his testimony, interwove the 1906 incident with the occurrences of April, 1917. Speaking of the quarrel that led to his assaulting his wife on April 7, 1917, he said: ''She reminded me of our last quarrel [referring to the time in 1906 when he choked her] and I said, 'Yes, I wish I had killed you then

and then I would have served my sentence in San Quentin, and would have gladly done it instead of living with you.'" And the plaintiff testified: "He said he would do San Quentin gladly to see me lay dead at his feet. And I told him it would not be his first trip there. And he said: 'By God, no, and I will kill you,' and he struck me two heavy blows. I raised my arm. He struck me on it and it was swollen to the elbow the next day. He struck me with his fist and said he was proud of it."

The witness, Effie Eyster, referring to the same incident, testified: "As I went through the hall to go into the bedroom I heard him say, 'I will kill you. I will kill you, by God, I will kill you,' and a muffled scream. I saw her the next morning and her arm was swollen."

The defendant testified that on this occasion he did strike her, but only on the back of her hand and with his fingertips, and that she never screamed or let out a sound.

This reference to the testimony shows that plaintiff only referred to San Quentin in response to defendant's brutal expression of regret that he had not killed her in 1906 (when he choked her) and served out his time in San Quentin. It was only in this connection, and under these conditions, that the plaintiff referred to his prison career.

We are of the opinion that, for all of the reasons above suggested, the plaintiff is entitled to a new trial, and it is so ordered.

Burnett, J., and Hart, J., concurred.